ORDERED.

Dated: September 06, 2017

_____
Jerry A. Funk
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE:

ROY BISHOP and TERESA BISHOP,   Case No.: 3:16-bk-0563-JAF
                                 Chapter 7
    Debtor.
_____/

GOD'S WORD TO THE NATIONS
MISSION SOCIETY, INC.,           Adv. Pro. No.: 3:16-ap-0112-JAF
    Plaintiff,
v.

ROY BISHOP,
    Defendant.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This adversary proceeding is before the Court upon the Complaint (Doc. 1) filed by GOD'S WORD TO THE NATIONS MISSION SOCIETY, INC. ("Plaintiff") against one of the two joint debtors in this case, Debtor, ROY BISHOP ("Debtor"), which seeks a judgment against Debtor and a determination that the debt is non-dischargeable under 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), and § 523(a)(6). On May 4, 2017, the Court conducted a trial. In lieu of closing oral argument,

the Court directed the parties to submit memoranda in support of their respective positions. Upon the evidence presented and the memoranda of the parties (Docs. 65, 66), the Court makes the following Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.

## *FINDINGS OF FACTS*

Debtor filed a petition under Chapter 7 of the Bankruptcy Code, on February 17, 2016. Plaintiff initiated this Adversary Proceeding on May 25, 2016. (Doc. 1). Reverend Donald Hackbardt (the "Reverend") testified on behalf of Plaintiff. The Reverend has been the chief executive officer and executive director of Plaintiff since 1992. Plaintiff is a nonprofit organization. In 1992, the Reverend joined Plaintiff to oversee a "translation team" tasked with drafting new English translations of original biblical scriptures and ancient texts written in Greek, Hebrew, and Aramaic. This translation process lasted approximately three years. Plaintiff then transitioned into an outreach mission providing/selling Bibles and other ministry-related literature.

Plaintiff needed new computer equipment to replace older models in its office. The Reverend happened to drive by a local computer store named PC Depot (the "Store") and inquired about purchasing new computers for his office. At that time, a person named simply "Akara" owned the Store. It is not clear who this person was, but the Reverend testified he had no problems during "Akara's" ownership. Not long after this, around 2012, Debtor took ownership of the Store. Debtor was the only person with whom the Reverend interacted after Debtor took over. This business relationship lasted from the first half of 2012 until the first half of 2014. Importantly, the Reverend acknowledges that, throughout this relationship, he relied on Debtor's input as to what hardware and software Plaintiff needed. The Reverend explained that Debtor "certainly seemed to understand what we might need, with some differences that occurred later on." The Reverend first became "concerned" about Debtor's performance in "early 2014."

As part of the business relationship, Debtor promised not to "mark up" any prices for hardware/software and to pass along those charges at cost. That is, Debtor promised to charge Plaintiff only for Debtor's labor in building and installing the systems. On direct exam, the Reverend testified that, early in the relationship, Debtor drew a diagram of five or six computers (four workstations and one print server, plus one laptop) and showed this diagram to the Reverend. The Reverend testified he only received three machines, though he later testified he received the laptop as well. Debtor explained that the Reverend and the Reverend's assistant each had two physical machines connected with a KVM switch. A KVM switch is a hardware device that allows the user to control multiple computers/machines from one keyboard, video monitor(s), and mouse. Therefore, there were four desktop workstation machines used by the Reverend and his assistant, as well as the central print server and the laptop, for a total of six machines. It appears the Reverend thought each of the two pairs of workstations were only one computer. It is unclear why the Reverend and his assistant each needed two machines, but the Reverend's admitted he was shown the diagram of these machines and agreed to their delivery.

The Reverend also testified that he never gave Debtor permission to unilaterally charge Plaintiff's credit card without direct permission. Debtor testified he never stored Plaintiff's credit card information and that, at each instance, the Reverend gave Plaintiff's credit card information at the time of sale, either in person or over the phone. No evidence was presented showing Plaintiff ever disputed any of the charges with its credit card company as unauthorized or made any reports to law enforcement regarding unauthorized charges. Further, the Court finds the Reverend and Plaintiff knew of all the now-disputed charges at or near the time the charges appeared on Plaintiff's monthly credit card statement. Further, the Reverend continued doing business with Debtor even after learning of these charges. Plaintiff's continued business relationship with

Debtor and failure to report unauthorized charges undermine the assertion that Debtor used the credit card without authorization.

Turning to specific items, Plaintiff presented several "invoices" from Debtor and various line items contained therein. All invoices/receipts and line items were typed by Debtor. Eleven invoices were admitted into evidence; the earliest was dated May 26, 2012; the last was dated January 15, 2014. (Doc. 60-2 at 2-12).

The Office Server

The first contested line item was for "MS Biz Svr 2012" for which Debtor charged $1,700.00, dated May 31, 2012. (Doc. 60-2 at 3). The Reverend testified that "MS Biz Svr 2012" was not installed on any machine he received from Debtor, indicating he thought this was a software line item. However, Debtor testified that "MS Biz Svr 2012" was his shorthand for a "small business server" or central server within the office—a physical machine. Debtor testified his actual cost for this hardware and software was what he charged Plaintiff, though he rounded to the nearest whole dollar when he passed the cost on to Plaintiff. That this item was charged in May 2012, at the beginning of the relationship, supports Debtor's testimony. The Reverend admits the server was delivered but contends was not actually needed. Whether or not the server was needed, the Reverend's testimony shows he was informed prior to agreeing to purchase the equipment and that he relied on Debtor's expertise to determine what equipment was needed. Plaintiff's evidence does not show that Debtor deceived or misled Plaintiff about this line item.

The KVM Switch

The second line item raised was for "Asus KV Series 500/6/Quad" for $491.75, charged on August 23, 2013. (Doc. 60-2 at 5). This was a KVM switch, as described above. Plaintiff's expert testified that, in general, a KVM switch would normally cost around $30. However, this

4

expert testimony is not evidence that *all* KVM switches cost $30 or that Debtor actually paid $30 for this particular KVM switch. No evidence was presented as to what Debtor paid for this particular switch other than his own testimony that he did not mark up any costs. The Court does not find any misrepresentation or deception as to this line item.

### Adobe Master Collection

The third line item was for "Adobe Master Collection" for which Debtor charged Plaintiff $8,647.00 on November 11, 2013. (Doc. 60-2 at 6). The Reverend testified that he agreed to purchase this software after receiving a phone call from Debtor saying the software was available for a one-thousand-dollar discount off the standard price. The Reverend's testimony shows he was aware of the $8,647.00 price prior to agreeing to purchase the software. The Reverend gave conclusory testimony that "Adobe Master Collection" was not installed on any of the machines; however, no examination of the machines was offered into evidence and the Reverend did not explain what he did to determine the software was not installed.

Plaintiff's credit card statement for November 2013 shows the Store charged Plaintiff for the "Adobe Master Collection" on November 11 but Plaintiff was also charged $9.99 directly by Adobe Systems (the maker of the Adobe software) on November 8. (Doc. 60-3 at 9). Plaintiff contends this is evidence that Debtor fraudulently/deceptively charged Plaintiff for the "Adobe Master Collection." As the Reverend testified, however, this $9.99 charge was for a preexisting monthly license for Adobe Acrobat X that Plaintiff had purchased prior to its relationship with Debtor. Debtor testified that he knew nothing about Plaintiff's existing monthly license with Adobe Systems and that he played no role in that. The Court finds that only Plaintiff could have cancelled its preexisting monthly Adobe license because Debtor did not purchase or control the preexisting license on Plaintiff's behalf.

5

Debtor testified his actual cost for the "Adobe Master Collection" was what he charged Plaintiff and no evidence to contrary was offered. Debtor explained that the price included licenses for the office computers as well as for computers at the Reverend's home. Debtor also explained this software was expensive because it included various optical character recognition (or OCR) capabilities along with various language packs for the OCR engine. These features were apparently related to Plaintiff's work translating ancient scripts. Plaintiff did not call the Reverend to rebut Debtor's testimony as to this charge.

<u>Microsoft Office 2010</u>

The fourth line item raised was "Office 2010 Licensing 10 Cal" for which Debtor charged Plaintiff $1,325.00 on November 21, 2013. (Doc. 60-2 at 7). The "10 Cal" stands for ten separate client access licenses. The Reverend testified he never received this software, and that only he and his assistant would need to use office desktop software—not ten different people. Debtor testified he had to purchase a 10-pack of licenses for this software because the Reverend requested licenses for the five machines at the office (four workstations and one laptop) plus other machines at the Reverend's home, including a machine for the Reverend's wife's real estate business. No rebuttal evidence was presented to contradict these assertions.

Further, while the Reverend's assistant testified she was not sure whether Microsoft Office was installed on any of the computers, she testified that she used Microsoft Word and Microsoft Excel—which are components of the Microsoft Office suite. She testified she used these programs on the machine delivered to her by Debtor. Therefore, the Court finds this software was delivered.

<u>LCD Monitors</u>

The fifth line item was for four "21.5 in LCD Monitors" for which Debtor charged Plaintiff $758.00 in total; two monitors for each workstation. (Doc. 60-2 at 8). The Reverend admitted he

received these monitors but claimed the monitors were not 21.5 inches in size. When asked by his own attorney on direct exam, the Reverend said he had never measured the size of the monitors and did not know monitors' size.

### Carbonite Backup

The sixth line item was for three "Carbonite Backup Lic[enses]" for which Debtor charged Plaintiff $179.97 on November 26, 2013. (Doc. 60-2 at 8). The Reverend said he never received this software. Plaintiff's credit card statement covering July 16 to August 15, 2013 was admitted into evidence over the objection of Debtor. (Doc. 60-3 at 4). The statement demonstrates Plaintiff's credit card was charged by the Carbonite company in the amount of $208.98, in addition to the $179.97 Debtor charged Plaintiff for the Carbonite licenses. Plaintiff contends Debtor was double-charging Plaintiff. However, Debtor did not know why Plaintiff's credit card was charged directly by Carbonite and assumed it was for a license(s) used on the Reverend's home computer. Plaintiff presented no evidence to rebut this. The Court finds that Debtor had nothing to do with, and no responsibility for, the charges to Plaintiff's credit card by Carbonite Backup. The Court further finds that any double payments for Carbonite Backup services was, like the preexisting Adobe license described above, the result of a failure to communicate rather than deceit or fraud.

### Networking and Wiring Installation

The seventh item was an invoice for hardware and labor related to network and wiring installation, including charges for new network cable (i.e., Cat 5e cable). (Doc. 60-2 at 9). The Reverend told Debtor not to purchase network cable because Debtor could have used leftover cabling retained from Plaintiff's previous office location. When asked by Plaintiff's counsel whether Debtor had installed any of the hardware listed on the invoice, the Reverend said: "I can only presume they were parts of whatever he installed . . . I mean I couldn't identify most of these

7

things in any way shape or form." Without more, this does not constitute evidence of deceit or fraud by Debtor. Further, Plaintiff's expert testified that Debtor charged Plaintiff $1/foot for network cable and that new network cable could be purchased for a substantially lower price. However, again, this is not evidence that Debtor actually paid less than $1/foot of cable or that he lied about not marking up hardware costs before passing those costs onto Plaintiff.

### Firewalls

The eighth line item was for "Network Security Solution Lifetime" for which Debtor charged Plaintiff $4,120.00. (Doc. 60-2 at 10). The Reverend said he consented to purchasing the software "but not at that price." When asked if Debtor had explained the price for this item ahead of time, the Reverend said, "No, I don't believe so." Based on this, the Court finds Debtor did not deceive Plaintiff as to the purchase price of this item and that Plaintiff did agree to purchase it. The ninth line item was for "Net Sol License Lifetime" for which Debtor charged Plaintiff $680.00. (Doc. 60-2 at 10). The Reverend said this item "just appeared" and that he had not consented to purchasing this item. The invoice with both line items was dated December 23, 2013. Debtor explained both items were network firewalls and, though it is somewhat unclear, his testimony appears to indicate that one item was software-based while the other was a hardware device. While the Reverend plainly stated he did not consent to purchasing this item, the totality of the evidence fails to establish either a misrepresentation or deceptive intent.

### Website

On March 18, 2014, the Store charged Plaintiff's credit card $9,595.00. (Doc. 60-3 at 16). The Reverend opined that this charge was for a website that was not delivered. At some point in early 2014, the Reverend stopped by the Store to inquire about having a website constructed. Debtor indicated a friend could construct a website, and the Reverend said he wanted to see what

8

a potential website would look like and what functionality it would have. The Reverend believed he was only discussing the possibility of building a website rather than entering into an agreement to build such a website. Debtor, however, testified that he has no knowledge/experience related to building websites or writing code of any sort. Debtor testified that a young web programmer brought cards by the Store to have available for customers asking for web-development work. Anytime a customer would inquire about building websites, Debtor would refer the customer to this person. When asked about the $9,595.00 charge, Debtor testified he did not know what this charge was for without looking at the related invoice. No such invoice was admitted into evidence, no explanation was offered for its absence, and there was no direct testimony indicating such an invoice even existed. The Court finds Debtor's testimony as to his complete lack of knowledge of the basis for this charge to be lacking in credibility and insufficient to explain this charge—a charge for such a substantial amount that occurred at the tail end of the relationship and just before Debtor began receiving the notice letters from the Reverend.

Email Server

On March 28, 2014, the Store charged Plaintiff's credit card $2,400.00. (Doc. 60-3 at 16). Both the Reverend and Debtor testified this charge was for an email server (which is a physical machine located within the office). The Reverend testified only that he was not told of the charge and had not agreed to the charge. Debtor testified that he built and delivered this system. No rebuttal or other evidence was presented regarding this machine. Given this evidence, the Court cannot find that deception or fraud was used to procure the $2,400.00.

Notice Letters

The Reverend hand-delivered a letter to the Store while the Store was closed, on April 28, 2014. In this letter, the Reverend laid out his concerns with Debtor's performance. A subsequent

9

letter was sent in May 2014. Finally, on May 21, 2014, the Reverend sent an email to Debtor. (Doc. 60-1 at 14). These letters and emails were the first formal notice informing Debtor of the concerns of the Reverend and Plaintiff.

Plaintiff's Expert

Over Debtor's unarticulated Daubert objection, Plaintiff's expert opined that the software and hardware sold by Debtor was marked up by Debtor. The expert's basis was his own independent research into the prevailing retail price of each item. The expert also opined that various items were "bogus charges" because he was unable to find such an item, as described in the invoice, through his research. Plaintiff questioned Debtor as to whether Debtor had statements showing the price Debtor paid for the hardware and software, but Debtor said he did not have such documents with him at trial. The evidence does not show that Debtor charged Plaintiff more than what Debtor paid for the hardware and software.

## *CONCLUSIONS OF LAW*

*A.     Count I – § 523(a)(2)(A)*

Count I seeks to have the debt owed for the reimbursements of hardware/software costs excepted from discharge pursuant to § 523(a)(2)(A), under a "false representation" theory. (Doc. 65 at 4). Plaintiff alleges Debtor lied by saying he would not mark up any software/hardware costs. "Section 523(a)(2)(A) sets forth three separate grounds for non-dischargeability: false pretenses, a false representation, and actual fraud." In re Lloyd, 549 B.R. 282, 291 (Bankr. M.D. Fla. 2016). "Courts have generally interpreted § 523(a)(2)(A) to require the traditional elements of common law fraud." Id.; Husky Int'l Elecs., Inc. v. Ritz, 136 S. Ct. 1581, 1586 (2016). When pursuing a "false representation" theory under § 523(a)(2)(A), the "creditor must prove that: (1) the debtor made a false representation [with intent] to deceive the creditor, (2) the creditor relied

on the misrepresentation, (3) the reliance was justified, and (4) the creditor sustained a loss as a result of the misrepresentation." In re Bilzerian, 153 F.3d 1278, 1281 (11th Cir. 1998); see also Field v. Mans, 516 U.S. 59, 73-75 (1995) (holding that § 523(a)(2)(A) requires justifiable rather than reasonable reliance).

Here, the Court concludes Plaintiff failed to present sufficient evidence to find a misrepresentation or deceptive intent by Debtor. Even assuming there was legally sufficient evidence, the Court finds the evidence does not prove the misrepresentation or intent necessary to prevail on Count I. No evidence was presented showing what Debtor paid for the hardware/software purchased on Plaintiff's behalf, and no explanation was offered for why it was not put into evidence. The two highest dollar-value charges were i) the Adobe Master Collection charge and ii) the $9,595.00 charge in March 2014. The Reverend admitted he was told the price of the Adobe Master Collection prior to agreeing to purchase the software, thereby negating the possibility of deception. Debtor explained the high cost of the Adobe Master Collection, and Plaintiff put on no evidence to rebut this explanation. The Court does have concerns with the $9,595.00 charge, see Part C. below. However, the evidence does not demonstrate a false representation concerning this charge or any other charge. Without more, the Court cannot find a misrepresentation or deceptive intent. Therefore, Plaintiff failed to prove its case as to Count I.

    B.    *Count II – § 523(a)(4)*

Count II seeks to have the charges arising from Defendant's alleged unauthorized use of Plaintiff's credit card, excepted from discharge pursuant to § 523(a)(4) under an embezzlement theory. 11 U.S.C. § 523(a)(4) (2016). "Embezzlement, in the context of a dischargeability proceeding, has been defined as [ ] the 'fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.'" In re Tomlinson,

11

220 B.R. 134, 136 (Bankr. M.D. Fla. 1998). "The elements of embezzlement under [ ] § 523(a)(4) are: (1) appropriation of funds by the debtor; (2) for the debtor's use or benefit; (3) done with fraudulent intent. Intent may be inferred from the debtor's actions and surrounding circumstances. Embezzlement, however, does not require that the embezzling debtor be acting as a fiduciary." 3 Norton Bankr. L. & Prac. 3d § 57:47 (July 2017).

Here, the Court cannot and does not find, based on the limited evidence presented, that Debtor used Plaintiff's credit card without authorization.

C.      *Count III – § 523(a)(6)*

Count III seeks to have the credit card charges excepted from discharge pursuant to § 523(a)(6), under a "conversion" and "willful and malicious injury" theory. Section 523(a)(6) "excepts from discharge any debt 'for willful and malicious injury by the debtor to another entity or to the property of another entity.'" In re Monson, 661 Fed. Appx. 675, 682 (11th Cir. 2016); 11 U.S.C. § 523(a)(6) (2016). "[A] debtor commits a 'willful' injury when 'he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury.'" Id. "'[M]alicious' means 'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.'" Id. at 683. "For the purposes of § 523(a)(6), malice can be implied. Constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice." Id. (citations and quote marks omitted). When the facts demonstrate the necessary maliciousness, "'willful and malicious injury' includes conversion, which is defined as the unauthorized exercise of ownership over goods belonging to another to the exclusion of the owner's rights." In re Jacobs, 243 B.R. 836, 846 (Bankr. M.D. Fla. 2000); 3 Norton Bankr. L. & Prac. 3d § 57:44 (July 2017).

Here, as to the $9,595.00 charge from March 2014, the Court finds the Debtor's explanation for this charge lacking in credibility and insufficient.  The Court concludes the $9,595.00 charge was an intentional act that was substantially certain to cause economic injury to Plaintiff and was wrongful and without just cause or excessive.  The large dollar-amount of the charge (in relation to the other charges) combined with the absence of any explanation for the charge demonstrates the implied malice necessary to prevail on Count III.  A debt is owed to Plaintiff for this amount and this debt will be excepted from discharge pursuant to § 523(a)(6).  In re Melton, 2013 WL 2383657 (Bankr. N.D. Ga. May 20, 2013); In re Saenz, 76 Collier Bankr. Cas. 2d 1683, 2016 WL 9021733 (Bankr. S.D. Tex. 2016).

The Court will enter a separate order consistent with these Findings of Fact and Conclusions of Law.